# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PAMELA RAY,

       Plaintiff,

v.                                         CV 14-773 WPL

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Pamela Ray filed an application for Disability Insurance Benefits and Supplemental Security Income on July 28, 2011. (Administrative Record ("AR") 35.) She alleges disability beginning April 2, 2007, due to Gulf War syndrome. (AR 87.) Administrative Law Judge ("ALJ") Myriam Fernandez Rice held a disability hearing on August 26, 2013. (AR 53-79.) On December 6, 2013, the ALJ determined that Ray was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 32-52.) Ray filed two appeals with the Appeals Council, but the Council declined her requests, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-12.)

Ray sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Reverse and Remand to Agency for Rehearing (Doc. 19.) The Commissioner of the SSA responded (Doc. 24), and Ray did not file a reply. For the reasons explained below, I deny Ray's motion and dismiss this case with prejudice.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2015). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's residual functional

2

capacity ("RFC").  *See Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996); 20 C.F.R.

§§ 404.1520(e), 416.920(e). The ALJ then determines the physical and mental demands of the

claimant's past relevant work in phase two of the fourth step and, in the third phase, compares

the claimant's RFC with the functional requirements of her past relevant work to see if the

claimant is still capable of performing her past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R.

§§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing her past work, then

she is not disabled. *Id.* The claimant bears the burden of proof on the question of disability for

the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See*

*Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir.

1987). If the claimant cannot return to her past work, then the Commissioner bears the burden, at

the fifth step, of showing that the claimant is capable of performing other jobs existing in

significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams*

*v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation

process in detail).

### FACTUAL BACKGROUND

Ray is a fifty-two-year-old woman with a high school education. (AR 82, 87.) Ray served

in the United States Army from 1998 to 2005, worked as a welder from 2002 to 2004, and was a

theater stage hand from 2004 to 2007. (AR 257.)

My discussion of the factual background surrounding this appeal focuses on those issues

presented in the briefing. The earliest record in the AR is dated May 11, 2006, when Roger

Beechie, M.D., saw Ray for depression and persistent fatigue. (AR 360.) Dr. Beechie noted that

he had seen Ray a year prior and performed multiple tests, including a test for mononucleosis,

for the fatigue, but all were unremarkable. (*Id.*)

Ray returned to Dr. Beechie three years later, on September 3, 2009. (AR 398.) Dr. Beechie described Ray as someone who has had "a significant emotional disturbance over a personal issue about neglect of her father and her grandmother." (*Id.*) Ray requested a refill on Lexapro and complained of some fatigue and myalgias. (*Id.*) Dr. Beechie encouraged Ray to continue attending counseling. (*Id.*)

Ray saw her primary care physician, Megan Babcock, M.D., at the Raymond G. Murphy VA Medical Center on March 3, 2010. (AR 535.) Dr. Babcock noted that Ray complained of weakness, aches in her muscles, and overwhelming episodic fatigue. (AR 535.) Dr. Babcock assessed Ray with depression in remission, fatigue, and weakness and ordered laboratory tests. (*Id.*) The test results were "all clinically acceptable," and there was no evidence of rheumatologic or muscle disease. (AR 530.)

On June 5, 2010, Ray saw William Tandberg, M.D., primarily for a visual disturbance, but she also informed him that she was worried about chronic fatigue syndrome, multiple sclerosis, and other multisystem disorders. (AR 514.) Ray stated that she had felt tired for the past several years and was gradually getting worse. (*Id.*) Dr. Tandberg noted that Ray runs a rescue mission for large and small animals. (*Id.*)

On January 27, 2011, Ray informed Dr. Babcock that her fatigue and extremity weakness were not better. (AR 505.) Dr. Babcock found Ray's joints to be normal; there was no swelling, stiffness, or redness. (*Id.*) Dr. Babcock ordered repeat laboratory tests for Ray's fatigue. (AR 757.) The labs did not "show any metabolic abnormality to explain the fatigue and weakness." (AR 495.)

Upon referral by Dr. Babcock, nurse practitioner Mindy Mason, ACNP-BC, examined Ray for fatigue and weakness on February 23, 2011. (AR 461.) Ray told Mason that she sleeps

sixteen to eighteen hours per day and wakes up "exhausted." (*Id.*) Mason noted that Ray lives on a two-acre farm with fifteen or more animals, and her significant other was only home on the weekends. (AR 462.) Mason assessed Ray with "chronic fatigue/?weakness with unknown etiology." (AR 493.) Anna Vigil, M.D., the attending neurologist, found that it was unlikely that Ray had a neuromuscular disease. (AR 464.) Dr. Vigil was "unable to provide a definitive diagnosis." (*Id.*) She ordered a sleep study to assess for sleep apnea. (*Id.*) Dr. Vigil noted that Ray's depression was successfully treated with Celexa, and Ray denied any recent feelings of depression or sadness. (AR 463.)  Dr. Vigil also wrote that "[d]espite her symptoms, she continues to maintain and care for multiple animals, which involves lots of physical activity." (AR 743.)

On March 28, 2011, Ray saw Shimer Carden, CNS, for a chief complaint of allegies. (AR 396.) Carden assessed Ray with, among other conditions, chronic fatigue and depression, though stable. (*Id.*) Carden saw Ray again on August 4, 2011, at which time Carden assessed her with malaise and fatigue, depression, and other conditions. (AR 408.)

Ray visited Dr. Babcock on September 27, 2011, to discuss her depression medications. (AR 480.) She continued to experience fatigue. (AR 482.) Dr. Babcock performed an exam for fibromyalgia, but Ray did not meet fibromyalgia criteria. (*Id.*)

On November 21, 2011, Ray reported to Dr. Babcock that she was still weak and fatigued at all times. (AR 475.) Ray also felt depressed, but denied the intent to harm herself or others. (*Id.*) Dr. Babcock assessed her with daily chronic fatigue and depression. (AR 476.)

Ray completed a Function Report on February 4, 2012. (AR 229.) She stated that, during the winter, she gets up every hour and a half to put more wood on her wood stove. (*Id.*) At sunrise, she eats breakfast and feeds her chickens, dogs, cats, goat, and two horses. (*Id.*) If she

can stay awake, she reads or cleans litter boxes. (*Id.*) Ray stated that she usually sleeps around sixteen hours per day. (*Id.*) Later in the day, she eats a second meal, feeds the animals again, and cuts and splits firewood. (*Id.*) She also collects eggs from her chickens. (AR 232.) Her sister pays for the animal feed. (AR 230.) Ray is often too tired to bathe, and it can be too painful to tip her head back to brush her teeth. (*Id.*) She does a few hours of housework per week. (AR 232.) Ray stated that she was looking for homes for her animals because she did not know how much longer she could carry feed or clean up after them. (AR 236.)

On January 26, 2012, Ray called a veteran suicide hotline for the first time. (AR 470-71.) Ray was grieving the deaths of her grandparents and a friend. (AR 471.) Ray stated that her animals were her kids and her reason for living. (*Id.*) She felt overwhelmed and tired. (*Id.*)

A responder from the suicide hotline followed up with Ray on February 21, 2012. (AR 467-68.) Ray stated that she was still overwhelmed trying to care for herself and her animals due to financial hardship. (AR 468.) On February 23, 2012, Ray reported feeling depressed due to separation from her partner of fifteen years. (AR 469.)

In a Third Party Function Report dated March 4, 2012, Ray's sister, Tracy Ray Wancho, verified that she was paying for Ray's animal feed and that Ray was looking for homes for the animals since she was unable to pay for the feed and it was getting harder to care for them. (AR 266-67.)

Kristen Widmer, M.D., performed a consultative examination of Ray on March 31, 2012. (AR 549-51.) Ray informed Dr. Widmer that she thought she had Gulf War syndrome. (AR 549.) Ray was in the Army but was not deployed to the Gulf. (*Id.*) She stated that she received three shots, three weeks in a row, which she was told were flu shots. (*Id.*) However, Ray was suspicious that these shots, which did not appear in her medical records, had something to do

with her symptoms, including weakness; fatigue; headaches; and pain, numbness, and tingling in all of her extremities. (*Id.*) Ray stated that her symptoms had been occurring for six to seven years. (AR 549.) She could do household chores such as sweeping, shopping, mopping, vacuuming, cooking, and dishes, but they made her fatigued, and she could not do what she used to be able to do. (AR 550.) With respect to Ray's allegations of Gulf War syndrome and fatigue, Dr. Widmer found "no objective evidence for functional limitation with regards to this allegation based on today's examination." (AR 551.)

On April 2, 2012, Ray saw Alan Dobson, M.D., regarding her "progressive fatigue" and headaches approximately twice per week. (AR 718.) Dr. Dobson found an "unclear etiology" for Ray's symptoms and noted that Ray needed a sleep study. (*Id.*)

On April 10, 2012, Dr. Babcock wrote a letter to Ray, explaining that Ray had "had quite a complete workup of [her] symptoms and we have not been able to assign a diagnosis to [her] symptomatology at this point." (AR 603.) Tests covered rheumatological (including lupus), infectious, neurological, and metabolic disorders, and they were all negative. (*Id.*)

Kay Ennis, Ph.D., performed a consultative psychological evaluation of Ray on April 21, 2012. (AR 559.) Ray reported that she becomes stressed and "copes by gathering comfort from her animals." (AR 560.) Ray also told Dr. Ennis that she "cannot perform tasks in a timely and appropriate manner." (*Id.*) Dr. Ennis diagnosed Ray with mood disorder due to reported pain and discomfort, with depressive features; moderate occupational problems; moderate problems with work; moderate problems with her primary support group; and a GAF of 52.[1] (AR 563.) Dr.

---

[1] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between fifty-one and sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." *Id.* Although the fifth edition of the *DSM* dropped the

Ennis also found that "[i]t is likely that Ms. Ray can understand, remember basic instructions, concentrate and persist at tasks of basic work. It is likely that she will be able to interact with the general public and/or co-workers appropriately and have flexibility to adapt to changes in the workplace." (AR 564.) Dr. Ennis further opined that Ray would benefit from medication management and therapy to deal with her depression. (*Id.*)

On July 26, 2012, Ray told Dr. Babcock that she was experiencing fatigue, intermittent pain in her limbs, and weakness. (AR 593.) Dr. Babcock diagnosed Ray with depression, primarily because no cause could be found for her fatigue. (*Id.*)

Ray completed a second Function Report on July 30, 2012. (AR 283-87.) Ray stated that she prays and reads scripture in the morning, feeds her animals, eats breakfast, and then tries to stay awake for as long as she can. (AR 283.) She explained that she has no electricity, so she reads until dark, bathes when it is warm enough, and receives help obtaining firewood for the winter. (*Id.*) Ray reiterated that she is trying to find good homes for her animals because she does not have many waking hours to spend with them. (AR 284.) Bathing tires her out so much that she can barely stay awake, and brushing her teeth hurts her arms and neck. (*Id.*) She goes outside once or twice a day. (AR 286.) On Wednesdays, she volunteers at the senior center, and on Sundays, she attends church with friends. (AR 286-87.) Ray stated that she likes to read, paint, and sculpt, though painting and sculpting are expensive and tire her easily. (AR 287.)

Jennifer Riggs, Ray's former partner, completed a Third Party Function Report on August 8, 2012. (AR 294-301.) Riggs wrote that Ray slept up to twenty hours per day and sometimes only rose to feed her animals and then went back to sleep. (AR 294-95, 301.) Further,

---

GAF rating in 2013 in favor of an alternative assessment schedule, Ray's mental health providers used this scoring method.

according to Riggs, Ray only changed clothes when she bathed twice a month. (AR 295.) She did not prepare meals often and was unmotivated to eat. (*Id.*) Ray alienated most of her family and friends. (AR 299.)

On August 10, 2012, Anne Ray, Ray's mother, completed a Third Party Function Report. (AR 313-20.) Anne wrote that Ray volunteers at the senior citizens' center; attends VA meetings; cares for her pets, including taking them to the veterinarian if necessary; and has no problems with personal care. (AR 313-14, 317.) Anne also noted that "we live in different states and do not see each other." (AR 313.)

On September 6, 2012, Amanda Beck, M.D., performed a sleep study on Ray. (AR 703-04.) Dr. Beck diagnosed Ray with mild obstructive sleep apnea. (AR 704.) Dr. Beck prescribed an Automatic Positive Airway Pressure ("APAP") device with an oximetry attachment. (*Id.*)

On December 6, 2012, Thuy Keriakes, D.O., wrote a letter to Ray that examination and testing at the VA Medical Center showed advanced arthritis in her neck. (AR 635.)

Ray saw Molly King, M.D., on February 7, 2013, for a neurology consultation. (AR 639-40.) Dr. King diagnosed Ray with mild right carpal tunnel syndrome and borderline left carpal syndrome. (AR 640.) She noted that Ray "has numbness and tingling in the hands to the wrists bilaterally with neck pain and arm pain that is diffuse and non-radiating. The right arm cramps at times. . . . Arm symptoms increase at night." (*Id.*) Dr. King recommended that Ray wear wrist splints while sleeping. (*Id.*) She also advised conservative management of Ray's neck pain. (*Id.*)

Diana Go, M.D., examined Ray on April 17, 2013, for a pulmonary sleep consultation. (AR 644-49.) Dr. Go noted that Ray had not received an APAP. (AR 644.) Ray continued to complain of daytime sleepiness. (*Id.*)

On May 23, 2013, Dr. Babcock wrote to Ray that she had made a referral to physical therapy for Ray's arthritis. (AR 642.)

Ray reported to Dr. Babcock on August 23, 2013, that she was feeling much better and was less fatigued. (AR 858.) She had no complaints of depression and was not taking any depression medications. (AR 859.) Ray said that she was not using an APAP or CPAP and was not experiencing daytime fatigue. (*Id.*) Ray had no complaints about symptoms from carpal tunnel syndrome. (AR 860.)

HEARING TESTIMONY

Ray testified that she receives $560 per month from the VA for forty percent disability due to advanced arthritis in her spine, carpal tunnel syndrome, and nodules in her lungs. (AR 58.) However, Ray asserted that her most "debilitating condition is [her] fatigue, and that's the only thing that has not been diagnosed yet." (AR 59.) Her fatigue began in 2005 or 2006 and was originally mild. (AR 68.) Her sleep apnea results were borderline. (AR 59.) She stated that she has around one good day per week, while the remainder of the days she is "either unconscious or barely conscious for 16 to 20 hours." (AR 60.)

Once or twice a week, Ray goes for a walk or walks her dogs off leash. (AR 61.) Ray drives sometimes, but other times relies on a friend to drive her. (*Id.*) On a typical day, Ray gets up at sunrise. (AR 63.) On a good day, she can be up for several hours, though she will often need a nap. (*Id.*) Ray performs light housework, such as laundry, on a good day. (*Id.*) On a bad day, she will wake up, drink a pot of coffee, and go back to sleep. (*Id.*) She might be awake for only two to three hours on a bad day, and she has "absolutely no diagnosis or idea why." (*Id.*)

10

Ray testified that she received vaccinations while in the Army, and she contended that a lot of veterans who received vaccinations have had fatigue. (AR 62.) She also confirmed that she has asthma and is allergic to plants, grass, trees, dust mites, etc. (AR 64-65.)

Ray enjoys painting, sculpting, and reading. (AR 65.) She is only able to read about once per week and stay awake and remember what she is reading. (AR 65-66.) Ray experiences a "really bad" headache about once a week. (AR 66.) Her depression "is so much better," and while she sometimes gets "blue or a little melancholy," it is "absolutely nothing like it used to be." (AR 67.) Ray stopped taking antidepressants around January 2012. (AR 60.)

Ray testified that she has carpal tunnel in her arms. (AR 69.) With regard to any limitations in her hands from carpal tunnel, Ray stated, "Sometimes I just—I can't feel them at all or they hurt really, really badly." (AR 70.)

The Vocational Expert ("VE") testified that a person who can perform light work; who can frequently, but not constantly, handle objects bilaterally; who must avoid concentrated exposure to fumes, odors, dusts, gases, and chemicals; who needs work limited to simple, routine, repetitive tasks; and who can maintain concentration, persistence, and pace for two hours at a time can perform the work of an order caller, an outside deliverer, or a parking lot signaler. (AR 76.)

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Ray's application for benefits according to the sequential evaluation process. (AR 32-52.) At the first step, the ALJ found that Ray had not engaged in substantial gainful activity since April 2, 2007, the alleged onset date. (AR 37.)

At the second step, the ALJ concluded that Ray suffers from the severe impairments of bilateral carpal tunnel syndrome (mild on the right and borderline on the left), advanced

spondylosis and disc degeneration of the cervical spine, arthritis, and asthma. (*Id.*) The ALJ determined that Ray's fatigue was not a medically determinable impairment due to an absence of medical signs and/or laboratory findings. (AR 37-38.) The ALJ cited notations by Dr. Beechie and Dr. Widmer that test results for Ray's fatigue were unremarkable and that there was no objective evidence for any functional limitations due to fatigue. (AR 38.) The ALJ concluded that Ray's mild obstructive sleep apnea and mood disorder constitute non-severe impairments because they have no more than a minimal effect on Ray's ability to do basic work activities. (*Id.*) With regard to activities of daily living, the ALJ found that Ray has a mild limitation. (*Id.*) The ALJ noted that Ray sweeps, mops, goes shopping, vacuums, cooks, does dishes, takes care of her animals, volunteers at the senior center, reads a lot, and goes to church with friends on Sundays. (*Id.*) While the ALJ recognized Jennifer Riggs's Third Party Function Report statement that Ray sleeps most of the day, she found that Ray's mother's statement showed that Ray was more active throughout the day. (*Id.*) The ALJ also found that Ray has mild limitations with respect to social functioning and concentration, persistence or pace and no episodes of decompensation. (AR 38-39.)

At step three, the ALJ found that Ray's combination of severe impairments did not equal one of the listed impairments. (AR 39-40.) In particular, the ALJ considered Ray's cervical spine condition, asthma, and carpal tunnel syndrome. (AR 40.)

At step four, the ALJ determined that Ray has an RFC to perform light work, except that Ray can perform frequent, but not constant, handling; she must avoid concentrated exposure to environmental irritants such as fumes, odors, dusts, and gases; she must avoid concentrated exposure to poorly ventilated areas; she is limited to simple, routine, repetitive tasks and can maintain attention and concentration, pace, and persistence for two hours at time; and she has the

ability to work for additional periods of two hours at a time before and after regularly scheduled breaks in the morning, at lunchtime, and in the afternoon. (*Id.*)

In making her RFC determination, the ALJ first summarized Ray's testimony at the hearing. (AR 41.) The summary included Ray's statements that her fatigue is her most debilitating condition, that she has one good day per week, and that the rest of the week she is barely conscious for sixteen hours. (*Id.*) The ALJ noted Dr. Widmer's conclusion that there was "no objective evidence for functional limitation with regards to" Ray's allegations of Gulf War syndrome, fatigue, or asthma. (AR 42.) The ALJ gave Dr. Widmer's opinion "some weight" because it was supported by her own objective findings. (*Id.*) However, the ALJ found that the record as a whole was more consistent with Ray's ability to do light work. (*Id.*) The ALJ noted that Ray had a sleep study and that she needed a CPAP for sleep apnea. (*Id.*) The ALJ also summarized Dr. King's findings of mild right carpal tunnel syndrome and borderline left carpal tunnel syndrome. (*Id.*) The ALJ pointed out Dr. King's description that Ray had "numbness and tingling in her hands to the wrists bilaterally with neck and arm pain that was diffuse and non-radiating. The right arm cramped at times. . . . Arm symptoms increase at night." (*Id.*) The ALJ noted that Dr. Babcock ordered wrist splints for Ray to try for three to four months. (AR 43.) The ALJ also wrote that there was no evidence that Ray has pursued ongoing counseling for depression and that Ray testified that she stopped taking antidepressants. (*Id.*)

Next, the ALJ discussed Ray's daily activities as they related to her RFC. (AR 43-44.) The ALJ highlighted Ray's ability to do certain household chores; her ability to drive (though not consistently); her daily care for her animals; her testimony that she can stay awake and read about once per week; her ability to get up every hour and a half during the winter to put wood on the stove; and her ability to cut, split, and carry firewood, though her friends help make sure she

has firewood. (*Id.*) While she likes painting and sculpting, these hobbies are expensive. (AR 43.) The ALJ noted that Ray has had to cut back on daily activities and that she asks friends for help a lot. (*Id.*)

The ALJ recognized Riggs's report that Ray sleeps most of the day and is only able to spend a small amount of time with her animals. (AR 44.) Yet the ALJ discounted this report, as Ray's mother's and sister's accounts revealed more activity, including frequently putting wood in her stove, taking care of her animals, volunteering at the senior center, and doing chores without assistance. (*Id.*)

The ALJ explained that, although Ray testified that fatigue was her most debilitating problem, "there is a scarcity of objective medical findings to support her complaints." (*Id.*) In particular, the ALJ noted, Ray only has mild sleep apnea, Dr. Widmer's report indicated that there is no objective evidence of functional limitation as to Ray's fatigue, and Ray's daily activities are inconsistent with her allegations of fatigue. (*Id.*) The ALJ also concluded that Ray's non-severe mood disorder limits her to simple, routine, repetitive tasks with the ability to maintain attention and concentration for two hours at a time. (AR 45.)

Based on Ray's RFC, the ALJ determined that Ray is unable to perform any past relevant work. (*Id.*)

At step five, the ALJ determined that Ray is capable of performing jobs that exist in significant numbers in the national economy, including order caller, with 55,063 jobs in the national economy and 203 jobs in the regional economy; outside deliverer, with 34,305 jobs in the national economy and 189 jobs in the regional economy; and parking lot signaler, with 56,125 jobs in the national economy and 125 jobs in the regional economy. (AR 45-46.)

Ray twice appealed the decision to the Appeals Council, but both times, the Council found that Ray's reasons for disagreeing with the hearing outcome did not provide a basis for changing the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-12.)

DISCUSSION

Ray argues for reversal and remand on several bases, claiming that the ALJ erred: 1) at step two in failing to find Ray's fatigue to be a medically determinable impairment; 2) at step two in finding that Ray's sleep apnea and mood disorder are non-severe impairments; 3) at step four in failing to consider Ray's non-severe impairments in her RFC analysis; 4) at step four in her evaluation of Dr. Widmer's opinion; 5) at step four in her evaluation of Ray's activities of daily living; 6) at step four in evaluating the effects of Ray's carpal tunnel syndrome; 7) at step five by failing to apply Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (Dec. 4, 2000),[2] which requires that the ALJ obtain a reasonable explanation between VE testimony and information provided by the Dictionary of Occupational Titles ("DOT"); and 8) at step five by failing to determine whether there are a significant number of other jobs available to support a denial of benefits.

### I.    Step Two: Fatigue as a Medically Determinable Impairment

Ray argues that the ALJ's finding that her fatigue is not a medically determinable impairment is contrary to substantial evidence of record. Ray contends that Dr. Beechie diagnosed her with fatigue in May 2006, that Carden diagnosed chronic fatigue and depression in March 2011 and malaise and fatigue and depression in August 2011, that Dr. Babcock diagnosed

---

[2] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

her with chronic daily fatigue, that Dr. Widmer diagnosed her with Gulf War syndrome/fatigue, and that Dr. Dobson diagnosed her with generalized fatigue. Ray asserts that her fatigue is a medically determinable impairment because there is medical evidence consisting of medical signs, symptoms, and laboratory findings. Further, Ray argues that she has four or more of the symptoms required for chronic fatigue syndrome, as set out in SSR 99-2p, 1999 WL 271569 (Apr. 30, 1999), which the ALJ did not properly analyze.

The Commissioner counters that there was no objective evidence or diagnosis for Ray's complaints of chronic fatigue. Further, the Commissioner asserts that no physician came to a definitive diagnosis regarding fatigue—contrary to Ray's assertions—much less chronic fatigue syndrome.

"A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20 C.F.R. §§ 404.1508; 416.908. The Commissioner is correct that the record lacks medical evidence to support a diagnosis of fatigue and, in fact, reflects explicit findings by Ray's doctors that her fatigue is unexplained by medical evidence. While multiple doctors marked down fatigue in the assessment portions of their records, it is apparent from the AR that these annotations merely reflect Ray's subjective complaints. For example, Dr. Beechie performed multiple tests on Ray to search for a medical reason to support her fatigue, yet all test results were unremarkable. (AR 360.) Dr. Babcock ordered tests in March 2010 and again in January 2011, yet all results were "clinically acceptable" (AR 530) and did not "show any metabolic abnormality to explain the fatigue and weakness" (AR 495). In March 2011, Mason assessed Ray with "chronic fatigue/?weakness with unknown etiology." (AR 493.) Dr. Vigil was also "unable to provide a definitive diagnosis." (AR 464.) Nor did Ray meet the criteria for fibromyalgia in a

16

test by Dr. Babcock in September 2011. (AR 482.) In March 2012, consulting physician Dr. Widmer found "no objective evidence for functional limitation with regards to [allegations of Gulf War syndrome, fatigue, and asthma] based on today's examination." (AR 551.) In April 2012, Dr. Dobson also found an "unclear etiology" for Ray's fatigue, despite performing multiple tests. (AR 603, 718.)

It is clear from the record that no physician found medical evidence to support a diagnosis of fatigue or chronic fatigue syndrome, and the record reflects physicians' consistent findings of no clear etiology for Ray's subjective symptoms of fatigue. Further, the ALJ cannot "overstep[] [her] bounds" by substituting her medical judgment for that of a physician. *Winfrey*, 92 F.3d at 1022 (citing *Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir. 1987)). As such, Ray's argument that the ALJ erred in failing to find her fatigue a medically determinable impairment is without merit.

## II.    Step Two: Sleep Apnea and Mood Disorder as Severe Impairments

Ray argues that the ALJ erred by finding that Ray's sleep apnea and mood disorder are non-severe, rather than severe, impairments. Ray asserts that she has made a de minimis showing that these conditions significantly limit her ability to do basic work activities, and she provides evidence from the record to support this de minimis showing.

The Commissioner argues that any potential error in failing to find that Ray's sleep apnea and mood disorder to be severe impairments at step two is immaterial to the outcome of the case.

"[A]ny error [at step two is] harmless where the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence." *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *see also Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) ("We can easily dispose of . . .

arguments[] which relate to the severity of [claimant's] impairments. The ALJ . . . made an explicit finding that [claimant] suffered from severe impairments. That was all the ALJ was required to do in that regard. [Claimant]'s real complaint is how the ALJ ruled at step five.").

In this case, the ALJ found four severe impairments—bilateral carpal tunnel syndrome, advanced spondylosis and disc degeneration of the cervical spine, arthritis, and asthma. (AR 37.) The ALJ did not make a finding of non-disability at step two, but rather proceeded through all five steps of the sequential evaluation process. As such, I find that even if the ALJ erred in failing to find that Ray's sleep apnea and mood disorder were severe, such an error would be harmless because the ALJ continued through the sequential evaluation process. Therefore, I find that this argument is without merit.

### III.   Step Four: Analysis of RFC Pursuant to SSR 96-8p

Ray argues that, even if the ALJ did not err in finding her sleep apnea and mood disorder to be non-severe impairments, the ALJ later erred by failing to properly consider the effects of these two impairments on her RFC, as required by SSR 96-8p, 1996 WL 374184 (July 2, 1996). The Commissioner counters Ray's argument by citing to instances in the ALJ's decision where the ALJ discussed Ray's sleep apnea and mood disorder in the context of her RFC finding.

SSR 96-8p requires that "[i]n assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Id.* at *5. "While a 'not-severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." *Id.*

The ALJ's decision reflects that she considered the limitations and restrictions imposed by Ray's sleep apnea and mood disorder, so Ray's argument is without merit. In her decision, the

ALJ noted that Ray needed to be set up with a CPAP for sleep apnea (AR 42), yet her sleep apnea was "mild" (AR 44). The ALJ also stated that Ray's "'non-severe' mood disorder limits her to simple, routine, repetitive tasks with the ability to maintain attention and concentration for two hours at a time." (AR 45.) The ALJ further pointed out that Ray had not been pursuing ongoing counseling for depression and that she had stopped taking antidepressants. (AR 43.)

### IV.     Step Four: Evaluation of Dr. Widmer's Opinion

Ray argues that the ALJ misquoted Dr. Widmer's findings several times in her decision. Ray objects to the ALJ's quotations of Dr. Widmer as saying there was "no objective evidence for functional limitations with regards to [Ray's] allegation of Gulf War syndrome." (AR 38, 42, 44.) Ray insists that the ALJ should have included the phrase "based on today's examination," as used in Dr. Widmer's report, such that the quote read as follows: "There is no objective evidence for functional limitation with regards to [the allegation of Gulf War syndrome/fatigue] *based on today's examination*." (*See* AR 551 (emphasis added by Ray).) Ray argues that Dr. Widmer specifically based her opinion on her consultative examination rather than on an evaluation of Ray's record as a whole, and that there is no indication in the record as to what documentation Dr. Widmer reviewed.

The Commissioner counters that the ALJ acknowledged in one of the same paragraphs in her decision as her discussion about Gulf War syndrome and fatigue that Dr. Widmer's finding that there was no objective evidence to support functional limitations with regard to Ray's asthma was "based on the examination." (*See* AR 42.) The Commissioner argues that the ALJ cited Dr. Widmer's report as an example of another physician who could not find a medically determinable reason for Ray's fatigue and that Ray has not shown that the ALJ erred in interpreting Dr. Widmer's report.

I find that any distinction between how the ALJ quoted Dr. Widner and the full quote found in the report is immaterial. There is no objective medical evidence anywhere in the record to support a diagnosis of fatigue, and by extension, any functional limitations related to fatigue. Therefore, this argument is without merit.

### V.      Step Four: Evaluation of Activities of Daily Living

Ray argues that the ALJ mischaracterized her activities of daily living. Ray contends that the ALJ erred by failing to qualify her statement that Ray can do household chores by including Ray's report to Dr. Widmer that "she gets fatigued while doing these and states that she just cannot do what she used to be able to do." (*See* AR 550.) Ray also argues that the ALJ should have included Ray's reports to Dr. Ennis that she copes with stress by gathering comfort from her animals and that she cannot complete tasks in a timely and appropriate manner. (*See* AR 560.) In addition, Ray asserts that the ALJ failed by failing to discuss the fact that Ray was looking for new homes for her animals because she did not know how much longer she could feed or clean up after them. (*See* AR 236.) Ray argues that her activities were more limited than the ALJ described.

The Commissioner argues that it is not persuasive for Ray to attempt to reargue the evidence of her daily activities, as "a reasonable person could agree that caring for horses and other livestock supported the ALJ's finding that she was capable of less physically demanding, light work." (Doc. 24 at 5.)

On appeal, I review this case "to determine whether the record as a whole contains substantial evidence supporting the ALJ's determination." *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990) (citing 42 U.S.C. § 405(g)). While the ALJ might have included more detail in her discussion of Ray's activities of daily living such that she also discussed Ray's subjective

assertions that she became fatigued, took a long time to complete tasks, and did not know how much longer she could care for the animals, it is undisputed that Ray was still taking care of multiple animals, including large animals, carrying feed, and cleaning up after them. Further, the ALJ did recognize that Ray had to "cut back on daily activities and she asks friends for help a lot." (AR 43.)

I find that the ALJ adequately evaluated Ray's activities of daily living, and the record as a whole contains substantial evidence to support the ALJ's determination of Ray's RFC.

**VI.      Step Four: Evaluating the Effects of Ray's Carpal Tunnel Syndrome**

Ray argues that the ALJ erred in evaluating the effects of Ray's carpal tunnel syndrome by failing to follow SSR 96-8p in determining that Ray can perform frequent, but not constant, handling. Specifically, Ray contends that the ALJ erred by failing to consider the effects of Ray's carpal tunnel symptoms on her RFC, including pain and the inability to feel a book when she holds one in her hands.

The Commissioner argues that Ray is disputing a factual finding with respect to whether she is only limited to frequent, but not constant, handling. As such, the Commissioner argues, I should defer to the ALJ's factual finding under the substantial evidence standard of review. The Commissioner contends that the ALJ's finding is reasonable in view of doctors only giving Ray wrist splints at night and not recommending further treatment. Further, the Commissioner points out that Ray does not refer to any medical opinion that would support a more limited use of her hands. The Commissioner requests that I not reweigh evidence.

It appears that Ray is referring to the requirement in SSR 96-8p that "[t]he RFC assessment must be based on *all* of the relevant evidence in the case record, such as: . . . [e]ffects of symptoms, including pain, that are reasonably attributed to a medically determinable

impairment." 1996 WL 374184, at *5 (emphasis in original). It is apparent from the ALJ's decision that while the ALJ did not specifically refer to Ray's testimony about pain, numbness, and tingling in her hands, she did refer to Dr. King's notations that Ray had numbness and tingling in her hands and wrists, neck and arm pain, and right arm cramps from the carpal tunnel syndrome, with symptoms worse at night. Accordingly, I find that the ALJ did not fail to follow the requirements of SSR 96-8p in evaluating the effects of symptoms of Ray's carpal tunnel syndrome, including pain, and Ray's argument of error is without merit.

### VII.     Step Five: Application of SSR 00-4p to VE Testimony

Ray argues that the ALJ erred by failing to reconcile an inconsistency in the VE's testimony, in accordance with SSR 00-4p, between the occupations of outside deliverer and parking lot signaler and Ray's RFC limitation that she must avoid concentrated exposure to environmental irritants such as fumes, odors, dusts, and gases. Ray cites to the DOT for the proposition that an outside deliverer requires frequent exposure to weather, DICOT 230.663-010 (G.P.O.), 1991 WL 672160 (January 1, 2008), and that a parking lot signaler requires constant exposure to weather and frequent other environmental conditions, DICOT 915.667-014 (G.P.O.), 1999 WL 687870 (January 1, 2008). Ray contends that the ALJ should have investigated and obtained a reasonable explanation from the VE for this asserted conflict.

The Commissioner argues that it is mere speculation that working outside would expose the worker to concentrated environmental irritants such as fumes, odors, dusts, and gases, as Ray does not provide any evidence to support her argument.

SSR 00-4p requires that "[w]hen a VE . . . provides evidence about the requirements of a job or occupation, the [ALJ] has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT." 2000 WL 1898704, at *4.

"If the VE's . . . evidence appears to conflict with the DOT, the [ALJ] will obtain a reasonable explanation for the apparent conflict." *Id.*

I agree with the Commissioner that there is no evidence to support Ray's argument that the outside deliverer and parking lot signaler jobs would subject her to concentrated exposure to the environmental irritants listed in Ray's RFC. That is, there is no evidence of a conflict between the VE's testimony and the DOT. Therefore, Ray's argument is without merit.

### VIII.   Step Five: Significant Number of Jobs

Ray argues, based on the assumption that the outside deliverer and parking lot attendant jobs are unavailable due to inconsistency with her RFC, that the ALJ failed to consider whether the number of jobs available as an order caller was significant. Ray points out that there are only 203 jobs in the regional economy and 55,063 in the national economy as an order caller.

The Commissioner argues that, even assuming the outside deliverer and parking lot attendant jobs are unavailable, the number of jobs available nationally as an order caller is significant. The Commissioner cites *Raymond v. Astrue* for the proposition that "the controlling statutes, federal regulations, and case law all indicate that the proper focus generally must be on jobs in the national, not regional, economy." 621 F.3d 1269, 1274 (10th Cir. 2009). There are 55,063 order caller jobs in the national economy. (AR 46.) The Commissioner cites to *Rogers v. Astrue* for a finding that 11,000 jobs in the national economy was substantial evidence to support a determination of nondisability. 312 F. App'x 138, 142 (10th Cir. 2009) (unpublished).

I previously found that the ALJ did not err in including the outside deliverer and parking lot attendant jobs as positions available to Ray. I now find that there is substantial evidence to support a determination of nondisability based on a sum of 145,493 jobs available to Ray in the

national economy (55,063 jobs as an order caller; 34,305 as an outside deliverer; and 56,125 as a parking lot signaler). Therefore, Ray's argument is without merit.

### CONCLUSION

I conclude that the ALJ did not commit legal error at steps two, four, or five, and her decision is supported by substantial evidence. Accordingly, I deny the motion to remand and dismiss this case with prejudice.

IT IS SO ORDERED.

_William P. Lynch_
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.